UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: GLACEAU VITAMINWATER MARKETING AND SALES PRACTICE LITIGATION (NO. II) | Case No. 1:11-md-02215-DLI-RML |
| BATSHEVA ACKERMAN, RUSLAN ANTONOV, and JAMES KOH, | Case No. 1:09-cv-00395-DLI-RML |
| Plaintiffs, | |
| -against- | |
| THE COCA-COLA COMPANY and ENERGY BRANDS INC., | |
| Defendants. | |
| JULIANA FORD, | Case No. 1:11-cv-2355-DLI-RML |
| Plaintiff, | |
| -against- | |
| THE COCA-COLA COMPANY and ENERGY BRANDS INC., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
<u>PLAINTIFFS' MASTER MOTION FOR CLASS CERTIFICATION</u>**

August 24, 2012

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ...........................................................................................2

ARGUMENT ..............................................................................................................11

I.      PLAINTIFFS BEAR A HEAVY BURDEN TO CERTIFY A CLASS ...........................11

II.     THE PROPOSED CLASSES VIOLATE ARTICLE III AND ARE
        OVERBROAD ...................................................................................................12

III.    PLAINTIFFS HAVE NOT DEMONSTRATED MEMBERSHIP IN THE
        PROPOSED CLASSES IS OBJECTIVELY ASCERTAINABLE .................................14

IV.     PLAINTIFFS HAVE NOT DEMONSTRATED COMMONALITY OR
        PREDOMINANCE OF COMMON ISSUES ..................................................15

        A.      Plaintiffs Bear The Burden To Demonstrate Commonality And
                Predominance ........................................................................................15

        B.      Plaintiffs Have Not Shown Causation Or Reliance Could Be Proven On A
                Common Basis .......................................................................................17

                1.      The Alleged Misrepresentations Were Not Uniform ..................................17

                2.      Whether Each Plaintiff Saw And Considered A Challenged
                        Statement In Buying Vitaminwater Is An Individual Issue ......................18

                3.      The "Reasonable Consumer" Standard Cannot Resolve Class
                        Issues Of Causation, Reliance, Or Materiality ..........................................23

                4.      No Presumption Of Reliance/Causation Can Apply To Bootstrap A
                        Predominance Finding .............................................................................24

                5.      Federal Law Preempts Purportedly Common Questions Relating
                        To Vitaminwater's Sugar Content ...........................................................26

        C.      Plaintiffs Have Not Shown An Injury Common To All Class Members .............27

        D.      Defendants' Affirmative Defenses Raise Individual Issues ...................................32

V.      THE NAMED PLAINTIFFS ARE NOT TYPICAL ...........................................................33

VI.     RULE 23(B)(2) CERTIFICATION IS INAPPROPRIATE .................................................34

CONCLUSION .................................................................................................................35

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ackerman v. The Coca-Cola Co.*,
  No. CV-09-0395, 2010 WL 2925955 (E.D.N.Y. July 21, 2010)...........3, 17, 18, 19, 26, 27, 32

*Akkerman v. Mecta Corp., Inc.*,
  62 Cal. Rptr. 3d 39 (Cal. Ct. App. 2007) .............................................................13

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)...........................................................................................11, 26

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) ..................................................................................12

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of NJ, Inc.*,
  448 F.3d 573 (2d Cir. 2006)......................................................................................16

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
  No. 08-1000-CV, MDL No. 1967 (W.D. Mo. July 23, 2012) ..................................28

*Brown v. Kelly*,
  609 F.3d 467 (2d Cir. 2010)......................................................................................35

*Campion v. Old Republic Home Prot. Co., Inc.*,
  No. 09-CV-748, 2011 WL 1935967 (S.D. Cal. May 20, 2011)................................14

*Caro v. Procter & Gamble Co.*,
  22 Cal. Rptr. 2d 419 (Cal. Ct. App. 1993) ..............................................................19

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
  433 F.3d 181 (2d Cir. 2005)......................................................................................12

*Chavez v. Blue Sky Natural Beverage Co.*,
  268 F.R.D. 365 (N.D. Cal. 2010) .............................................................................27

*Cleary v. Phillip Morris Inc.*,
  656 F.3d 511 (7th Cir. 2011) ....................................................................................23

*Cohen v. DirecTV, Inc.*,
  101 Cal. Rptr. 3d 37 (Cal. Ct. App. 2009), *review denied* (Feb. 10, 2010) ............24

*In re Currency Conversion Fee Antitrust Litig.*,
  230 F.R.D. 303 (S.D.N.Y. 2004) ..............................................................................32

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ................................................................ 12

*Dupler v. Costco Wholesale Corp.*,
    249 F.R.D. 29 (E.D.N.Y. 2008) ...................................................... 25, 26

*Edwards v. Ford Motor Co.*,
    No. 11-CV-1058, 2012 WL 2866424 (S.D. Cal. June 12, 2012) .................. 24

*F.D.I.C. v. Dintino*,
    84 Cal. Rptr. 3d 38 (Cal. Ct. App. 2008) .............................................. 32

*Fitzpatrick v. General Mills, Inc.*,
    635 F.3d 1279 (11th Cir. 2011) ............................................................ 25

*Gartin v. S&M Nutec LLC*,
    245 F.R.D. 429 (C.D. Cal. 2007) ......................................................... 33

*Gary Plastic Packaging Corp. v. Merrill Lynch*,
    903 F.2d 176 (2d Cir. 1990) ............................................................... 32

*Gonzales v. Comcast Corp.*,
    No. 10-cv-01010, 2012 WL 10621 (E.D. Cal. Jan. 3, 2012) ..................... 34

*Haynes v. Planet Automall, Inc.*,
    276 F.R.D. 65 (E.D.N.Y. 2011) .......................................................... 16

*Horne v. Flores*,
    557 U.S. 433 (2009) ......................................................................... 12

*In re Initial Public Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ................................................................ 11

*Jermyn v. Best Buy Stores, L.P.*,
    256 F.R.D. 418 (S.D.N.Y. 2009) ..................................................... 25, 26

*Johns v. Bayer Corp.*,
    280 F.R.D. 551 (S.D. Cal. 2012) ........................................................ 24

*Koch v. Acker, Merrall & Condit Co.*,
    967 N.E.2d 675 (N.Y. 2012) .............................................................. 16

*Kowalski v. YellowPages.com, LLC*,
    No. 10 Civ. 7318, 2012 WL 1097350 (S.D.N.Y. Mar. 31, 2012) ............... 33

*Kwikset Corp. v. Super. Ct.*,
    246 P.3d 877 (Cal. 2011) .................................................................. 17

*Lawrence v. Philip Morris USA, Inc.*,
   -- N.E.2d ---, No. 2011-574 (N.H. Aug. 21, 2012) ................................................21

*Lewis Tree Serv., Inc. v. Lucent Techs. Inc.*,
   211 F.R.D. 228 (S.D.N.Y. 2002) ........................................................................33

*Marcus v. BMW of N. Am., LLC*,
   -- F.3d ---, No. 11-11937, 2012 WL 3171560 (3d Cir. Aug. 7, 2012) ...........15, 17

*Martin v. Dahlberg, Inc.*,
   156 F.R.D. 207 (N.D. Cal. 1994) ......................................................................24

*Mazur v. eBay Inc.*,
   257 F.R.D. 563 (N.D. Cal. 2009) ......................................................................13

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) ...........................................................16, 22, 27, 32, 33

*Mirkin v. Wasserman*,
   858 P.2d 568 (Cal. 1993) ..................................................................................24

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010) .........................................................................26, 32

*Nationwide Life Ins. Co. v. Haddock*,
   460 Fed. Appx. 26 (2d Cir. 2012) ....................................................................34

*Newman v. RCN Telecom Servs., Inc.*,
   238 F.R.D. 57 (S.D.N.Y. 2006) ........................................................................32

*Osborne v. Subaru of Am., Inc.*,
   243 Cal. Rptr. 815 (Cal. Ct. App. 1988) ..........................................................24

*Oscar v. BMW of N. Am., LLC*,
   No. 09 Civ. 11, 2012 WL 2359964 (S.D.N.Y. Jun. 19, 2012) ...........................26

*Oshana v. Coca-Cola Co.*,
   472 F.3d 506 (7th Cir. 2006) ........................................................................13, 14

*People ex rel. Spitzer v. County Bank of Rehoboth Beach, Del.*,
   846 N.Y.S.2d 436, Cal. Civ. Code 1783 (CLRA) ...........................................33

*Perez v. Metabolife Int'l Inc.*,
   218 F.R.D. 262 (S.D. Fla. 2003) ......................................................................15

*Pfizer Inc. v. Superior Court*,
   105 Cal. Rptr. 3d 795 (Cal. Ct. App. 2010) ..................................................13, 23

*In re Prempro*,
230 F.R.D. 555 (E.D. Ark. 2005)........................................................................22

*Rader v. Teva Parenteral Medicines, Inc.*,
276 F.R.D. 524 (D. Nev. 2011)..........................................................................21

*Sanders v. Apple Inc.*,
672 F. Supp. 2d 978 (N.D. Cal. 2009) ................................................................13

*Matter of Schulz v. State of New York*,
615 N.E.2d 953 (N.Y. 1993)...............................................................................32

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
No. MDL-1703, 2012 WL 1015806 (N.D. Ill. Mar. 22, 2012)........................13, 25

*Sejias v. Republic of Argentina*,
606 F.3d 53 (2d Cir. 2010).................................................................................14

*Sevidal v. Target Corp.*,
117 Cal. Rptr. 3d 66 (Cal. Ct. App. 2010) .....................................................13, 24

*Shields v. Walt Disney Parks and Resorts US, Inc.*,
279 F.R.D. 529 (C.D. Cal. 2011) .......................................................................34

*Solomon v. Bell Atl. Corp.*,
777 N.Y.S.2d 50 (N.Y. App. Div. 2004) .........................................................22, 32

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008).................................................................................11

*Thomas v. JPMorgan Chase & Co.*,
811 F. Supp. 2d 781 (S.D.N.Y. 2011)...................................................................12

*Thompson v. Am. Tobacco Co., Inc.*,
189 F.R.D. 544 (D. Minn. 1999)..........................................................................15

*In re Tobacco II*,
207 P.3d 20 (Cal. 2009) .............................................................12, 13, 17, 23, 31

*UFCW Local 1776 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010).............................................................................16, 22

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) .............................................................................. passim

*Webb v. Carter's Inc.*,
272 F.R.D. 489 (C.D. Cal. 2011).........................................................................24

*Weiner v. Snapple Beverage Corp.*,
    No. 07 Civ. 8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) .............................................14

*Wiener v. Dannon Co., Inc.*,
    255 F.R.D. 658 (C.D. Cal. 2009) .............................................................................................33

*Xavier v. Philip Morris USA Inc.*,
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) ...........................................................................14, 28

*In re Zyprexa Prods. Liab. Litig.*,
    671 F. Supp. 2d 397 (E.D.N.Y. 2009) .............................................................................11, 27

### Statutes

Cal. Bus. & Prof. Code § 17204 ........................................................................................................17

Cal. Bus. & Prof. Code § 17535 ........................................................................................................17

Cal. Civ. Code § 1750 .........................................................................................................................17

## PRELIMINARY STATEMENT

*Wal-Mart v. Dukes* emphatically ended the era of plaintiffs seeking certification based on their own pleadings and mere promises to supply uniform evidence at trial. *Dukes* requires a plaintiff to provide "significant" and "convincing" proof that satisfies the Rule 23 requirements. Here, the Court need go no farther than plaintiffs' own papers to conclude they fail to meet their considerable burden.

Plaintiffs' Complaint challenges 12 statements made in connection with the marketing of vitaminwater.[1] However, after full class discovery, plaintiffs' evidence suggests that—at best—only three or four of the nine named plaintiffs have seen or considered even a few of these statements, and there is no evidence that *any* plaintiff ever saw seven of the twelve. Thus, the record refutes any purported "uniformity," even among the hand-picked named plaintiffs. Nor do plaintiffs offer any consumer survey or expert opinion suggesting that consumers generally were misled by any of these statements, or even a single anecdotal report beyond the named plaintiffs. They also fail to propose a supportable methodology to determine who would be in the various classes or any damages. Granting plaintiffs' motion on this anemic fact record would be tantamount to certifying on the pleadings alone, a proposition *Dukes* squarely rejected.

Lacking uniform evidence about the challenged marketing statements, plaintiffs ground their certification bid almost entirely on the notion that consumers universally believed vitaminwater contained only water and vitamins, but instead it was "just another sugary soft drink." However, Judge Gleeson already ruled that claims based on sugar content were preempted. Plaintiffs cannot obtain certification by invoking a rejected legal theory. In any

---

[1] To the extent plaintiffs seek to certify a more limited set of representations, neither their master brief nor the supplemental briefs identify any such subset.

event, with respect to sugar, the record again demonstrates wide variation in consumer expectations and understandings that preclude certification.

In addition to plaintiffs' evidentiary deficiencies, facts introduced by defendants confirm no class should be certified for independent reasons.  An unrebutted consumer survey shows vitaminwater buyers vary in whether they saw the challenged statements, found them material, or knew about its sugar content.  Consumers buy vitaminwater for differing reasons unrelated to any portion of the label they might have considered.

For these and other reasons, plaintiffs—even had they offered the "substantial" evidence *Dukes* requires—cannot invoke any presumption of materiality, causation, or actual injury; their class definition violates Article III; and they cannot establish commonality, typicality, or the other requirements of Rule 23, just as a Southern District of New York judge concluded in a similar action involving Snapple beverages.

## STATEMENT OF FACTS

**<u>The Underlying Dispute</u>**.  Vitaminwater is a highly successful line of beverages with a devoted consumer base.  The numerous flavors at issue each contain (among other ingredients) vitamins, minerals, sugar, and water.  Although plaintiffs characterize vitaminwater as essentially a non-carbonated soda, it has substantially *less* sugar than most sodas.  Whereas vitaminwater has never contained more than 32.5 grams of sugar per 20-ounce bottle, Coca-Cola Classic contains 66 grams; Pepsi Cola 69 grams; and other sodas even more.  *See* Decl. of I. Nesser, Aug. 24, 2012 ("Nesser Decl."), Ex. B, Ex. O at 25:10-15, 29:2-9, Ex. P; Decl. of C. Martinez, Aug. 4, 2012 ("Martinez Decl.") ¶¶ 2-4.

Vitaminwater bottles have a three-part label.  The left panel discloses each product's precise sugar and vitamin content, among other information.  The right panel contains the ingredient list, which also discloses sugar and the different included vitamins for each flavor.

2

*See, e.g.* Nesser Decl. Ex. A ("Ackerman Tr.") 76:14-79:2, 133:8-24; *id.* Ex. B (product labels); *id.* Ex. E ("Cook Tr.") 120:6-121:1.  Plaintiffs do not suggest any of this information is inaccurate.

**Plaintiffs Varied in the Extent to Which They Saw or Considered the Challenged Marketing Statements**.  Plaintiffs' allegations primarily involve twelve allegedly misleading statements made in connection with the labeling and/or marketing of vitaminwater.  *See Ackerman v. The Coca-Cola Co.*, No. CV-09-0395, 2010 WL 2925955, at *5 (E.D.N.Y. July 21, 2010) (listing the twelve statements).  Even among the nine named plaintiffs, however, plaintiffs cannot offer any evidence of uniformity:

- As to seven of the twelve statements (Nos. 5-12), plaintiffs offer no evidence that *any* of the named plaintiffs saw these statements or that they played any role in their purchase decisions.  *See* Decl. of D. Clark-Weintraub in Support of Master Mot. to Certify Class ("Clark-Weintraub Decl.") Exs. C-J.

- Concerning the phrase "water + vitamins = all you need" (statement 2), plaintiffs' record shows only three plaintiffs saw this statement and thought it was even possibly misleading.  *Id.* (Ackerman, Antonov, Koh).  There was no clear testimony the statement played a role in their purchase decisions.

- As to flavor names such as "rescue" or "defense" (statement 3), plaintiffs' record shows that only three of the nine plaintiffs even arguably claim a particular flavor name is misleading, and again there is no clear testimony they bought *because* of the name. *Id.* (Ackerman, Ford and Koh).[2]

---

[2]   Defendants say "arguably" because Ms. Ackerman, for example, complained about the "revive" name when the bottle was placed in front of her at deposition; yet plaintiffs offer no record evidence she ever bought the "revive" flavor.  *See* Clark-Weintraub Decl. Ex C at p.ID #1064.

3

•     As to the description of the product as a Nutrient Enhanced Water Beverage (statement 1), only four of the nine mentioned this statement as a possible misrepresentation; none testified they bought because of this statement. *Id.* (Ackerman, Antonov, Ford, Koh).

Plaintiffs put forward *no* evidence that five of their plaintiffs (Armada, Khaleel, Volz, Cook or Squiabro) saw or relied on a *single one* of the twelve challenged statements, apart from merely viewing the "vitaminwater" name. *Id.* Exs. G-J.

Nor could there be uniform exposure to these statements among the general public. Statements 7-12 in Judge Gleeson's opinion were posted only on the vitaminwater website, only for a limited period ending in late 2008 or early 2009, and at different periods for different statements. *Id.* Ex. B; Nesser Decl. Ex. R. There is no evidence any plaintiff saw any of these statements. The statements also appeared only in relation to certain flavors. *See* Compl. ¶ 28. Similarly, the statements "vitamins + water = all you need" and "vitamins + water = what's in your hand" appeared on different flavors at different times. *See* Clark-Weintraub Decl. Ex. B.

Plaintiffs bought vitaminwater for reasons unrelated to the name or any other challenged statement. For example, Ms. Ackerman initially relied solely on a friend's recommendation, did not read the label, and recalls only seeing the name "vitaminwater" and a reference to 100 percent Vitamin C. Ackerman Tr. 24:6-7 (her friend had said "this [is] so great, so I just bought one"); *see also id.* 21:18-22:19. Similarly, Mr. Armada bought vitaminwater on an impulse solely because the "XXX" flavor name caught his attention, not any other statement. *See* Nesser Decl. Ex. D ("Armada Tr.") 12:5-14:23. Mr. Koh was also an impulsive buyer. Nesser Decl. Ex. H ("Koh Tr.") 8:8-19. Mr. Squiabro first bought vitaminwater simply because he saw musician Curtis Jackson drinking it in a music video. Nesser Decl. Ex. I ("Squiabro Tr.") 10-13.

Other plaintiffs never saw any information about vitaminwater apart from limited and differing portions of the product label.  *See* Nesser Decl. Ex. G ("Khaleel Tr.") 12:23-13:14; 24:21-25:2; Nesser Decl. Ex. J ("Volz Tr.") 78:8-24; Cook Tr. 29:23-30:25; Koh Tr. 62:17-24.  Others saw nothing more than the label and a billboard or poster.  *See* Nesser Decl. Ex. C. ("Antonov Tr.") 61:13-62:15.  In contrast, other plaintiffs had more specific recollections about being influenced by marketing.  Ms. Ford testified she had seen a few advertisements about vitaminwater that induced her consumption, such as a commercial about a vitaminwater drinker using her sick days for fun, Nesser Decl. Ex. F ("Ford Tr.") 97:9-98:6, 99:2-11, and a poster with pictures of the flavors and the line, "Flu shots are so last year," *id.* 93:12-21.

**The Named Plaintiffs Varied In Their Understanding of Vitaminwater's Sugar Content**.  Plaintiffs' moving papers cherry-pick out of context deposition quotes to suggest every named plaintiff uniformly (a) was unaware of any sugar content, and (b) thought vitaminwater contained only vitamins and water.  Br. at 3-4.  A fairer look at the record exposes this characterization as an utter falsehood.

- Four of the nine named plaintiffs admit knowing vitaminwater contained sugar before ever buying it.  *See* Ackerman Tr. 29:14-15 ("I knew it had some sugar.  I was fine with that"); *id.* 37:15-39:13; Cook Tr. 47:1-22; 98:4-12 (knew it contained sugar and at least five other ingredients); Ford Tr. 37:17-23; 39:14-17; Koh Tr. 134:9-12.

- Two others knew or suspected vitaminwater had sugar after their first purchase but continued drinking it anyway.  *See* Khaleel Tr. 15:12-22; 21:10-22:10; Antonov Tr. 27:9-28:17; 31:1-6.

- Plaintiff Volz knew vitaminwater had natural sweeteners (and thus that sugar could possibly be one of those sweeteners).  *See* Volz Tr. 40:13-15; 35:18-20.

• The record reflects that *none* of the nine named plaintiffs clearly believed vitaminwater contained only vitamins and water when they purchased the product.[3]

**Plaintiffs Varied in the Extent They Considered Sugar Content Material to Their Purchase Decisions**.  The plaintiffs' testimony also shows not every plaintiff found the presence and amount of sugar to be material.  For example:

• Ms. Ackerman testified that even after she read the vitaminwater label and confirmed the amount of sugar and vitamins, *she continued to buy it* because "I still like the drink."  Ackerman Tr. 102:9-103:3.  She only stopped buying it because she felt it was a "conflict" to continue drinking vitaminwater while simultaneously claiming it was deceptively marketed.  Ackerman Tr. 102:9-103:3.  She concedes she was not deceived at all when she continued to buy it after reading the label.  *Id.* 106:4-10.

• Mr. Cook remarkably conceded he filed suit *without investigating how much sugar vitaminwater actually contained.*  Cook Tr. 35:3-36:16; 58:21-59:3; 60:25-61:13.  He simply sought a drink that was "good" and more nutritious than soda.  *Id.* 84:9-14; 13:8-11.  When told at deposition how little sugar vitaminwater actually has, he said that level was "great."  *Id.* 72:23-73:4.  He now drinks Gatorade, which contains *more* sugar than vitaminwater.  *Id.* 18:24-19:6; 104:9-105:5; *compare* Nesser Decl. Ex. B, Ex. O at 25:10-15, 29:2-9, Ex. P (32.5 grams of sugar in 20 oz. vitaminwater) *with* Martinez Decl. ¶ 5 (34 grams in 20 oz. Gatorade).

• Mr. Volz was never interested in the precise amount of sugar in vitaminwater, only that it had less sugar than sodas (which it does).  Volz Tr. 22:3-9.  He also now drinks Coca-Cola and Gatorade despite their higher sugar levels.  *Id.* 90:7-13.

---

[3]  *See, e.g.,* Ackerman Tr. 13:7-12; Antonov Tr. 27:9-28:17; 31:1-6; Armada Tr. 28:5-29:20; Cook Tr. 98:4-12; Ford Tr. 37:17-23; 39:14-17; Khaleel Tr. 15:12-22; 21:10-22:10; Koh Tr. 30:16-18, 69:8-12, 134:9-12; Volz Tr. 40:13-15; 35:18-20.

•       Mr. Armada testified that "sugar content is important to [him]," but "[n]ot important enough to read the label." Tr. 65:11-14.  After learning how much sugar was in the product, he continued buying it for "[t]wo to three more months." *Id.* 47:16-22.

•       Mr. Koh was never concerned about the calories in vitaminwater.  Koh Tr. 138:12-19.  His complaint is that vitaminwater should have contained more vitamins, *id.* 29:23-25, and at least some juice, *id.* 30:16-18.  He also believes the green tea flavor should have contained "an ingredient from green tea." *Id.* 69:8-12.

•       Messrs. Khaleel and Antonov continued drinking vitaminwater after knowing it had sugar.  *See* Nesser Decl. Ex. G ("Khaleel Tr.") 15:12-22; 21:10-22:10; Antonov Tr. 28:25-29:5.

•       Ms. Ford stopped drinking vitaminwater water to save money, because she thought she "should drink regular water," Tr. 80:18-23, and because she read somewhere that it was better to consume vitamins in solid foods rather than liquids, *id.* 17:20-18:4; 25:11-24; 51:1-13.  Rather than a concern about sugar, she thinks vitaminwater should more clearly disclose that not every vitamin is contained in the full recommended daily amount.  *Id.* 100:13-22.

Although many plaintiffs professed to be "health conscious" and aware labels disclosed ingredient levels, most never bothered to read those portions of the label even after drinking hundreds of bottles.  *See, e.g.* Khaleel Tr. 18:25-19:8; 12:9-11; 77:16-78:5; 81:16-82:9; Antonov Tr. 62:21-24; 51:8-22; 37:10-13 (reads *Men's Fitness*; reads labels on vitamin products he buys; but didn't read the vitaminwater label); Volz Tr. 109:11-19 (tries to avoid high-calorie, high-fat, and high-sugar products); Koh Tr. 23-24.  The named plaintiffs conceded that consumers who, unlike them, read the clear disclosures on either side panel would not be deceived and would

have no claims.  *See, e.g.,* Cook Tr. 121:2-22; Koh Tr. 130:8-12; Ackerman Tr. 106:4-10; Squiabro Tr. 64:1-24.

**Survey Evidence Corroborates the Wide Variation in Consumer Purchase Decisions**.  Contrary to plaintiffs' contention that all consumers sought a drink with no sugar, a survey shows consumers identified more than 50 different reasons for buying vitaminwater.[4] Very few consumers began purchasing vitaminwater on the belief it had no sugar, no calories, or in an effort to lose weight.[5]  Taste or flavor is the number one reason consumers continue to purchase vitaminwater (45%).[6]

Consumers' awareness of the sugar and caloric content of vitaminwater also varies.  Even before seeing a vitaminwater bottle, 47.2% of respondents knew it contains calories.  Others did not know either way (31.5%), and only 21.3% thought it was calorie free.  Similarly, without exposure to the bottle, 58% of respondents thought vitaminwater contains some form of sugar (sugar, corn syrup, fructose, etc); 11.1% were not sure, and only 30.8% thought it did not.[7]  After viewing the bottle, consumers had even greater understanding that it contains sugar and calories (64.3% and 48.0% respectively).  *Id.*  These results were unsurprising because 83% of respondents check the calories, read the label's ingredient list, and/or read the nutrition facts panel before buying this type of product.[8]

Despite plaintiffs' contention that consumers place great weight on phrases such as "nutrient enhanced water beverage," "vitamins+water = what's in your hand," or "vitamins +

---

[4]  Nesser Decl. Ex. L (Expert Report of Dr. Carol Scott, Ph.D.) ("Scott Exp. Rep.") at Ex. 10-2 and 10-3.

[5]  *Id.* at 2.

[6]  *Id.* and Ex. 10-3.

[7]  *Id.* at 13.

[8]  *Id.*  This conclusion accords with that of expert Dr. Elizabeth Applegate, who opined that a majority of individuals seeking healthier food and beverage choices utilize the Nutrition Facts Panels and ingredients lists on product labels.  *See* Nesser Decl. Ex. J (Expert Report of Elizabeth Applegate, Ph.D.) ("Applegate Exp. Rep.") at 4.

water = all you need," they had little recall of even seeing these statements, and they played varying, but low, levels of importance in consumer's purchases—even after being told that the statements were on the label.[9]

**What Consumers Learned Through the Media About Vitaminwater and Similar Products Differs**.  The pervasive consumer awareness that vitaminwater contains sugar reflected in Dr. Scott's survey derives not only from consumers reading labels, but also media coverage concerning this category of beverage.  As detailed in the expert report of Stephen Swisdak, beginning in 2002 the national media (*e.g.,* television networks, newspapers and magazines) began to report on the sugar content, calories, and recommended serving size of vitaminwater and similar products.[10]  This coverage steadily increased in subsequent years.[11]  There was also wide discussion of vitaminwater on websites geared toward health and fitness issues and parenting.[12]  The issue was further featured in the newsletter of the Center for Science in the Public Interest, which claims to have 900,000 subscribers.[13]  Mr. Armada, for example, testified that he knew about vitaminwater's sugar content because of a news story.  Armada Tr. 16:17-25.

**"Healthiness" Varies from Consumer to Consumer**.  The central premise of plaintiffs' suit is that vitaminwater is portrayed as a health drink but cannot form part of a healthy diet. However, as explained in the report of Dr. Elizabeth Applegate, whether a nutrient-enhanced water beverage such as vitaminwater can be part of a healthy diet depends upon the individual's overall fitness and weight, consumption level of the product, and the mix of other foods and

---

[9]   Scott Exp. Rep. at 15-17, 21 and Ex. 10-12.

[10]   Nesser Decl. Ex. N (Expert Report of Stephen G. Swisdak, M.A.) ("Swisdak Exp. Rep.") at 2.

[11]   *Id.* at 2.

[12]   *Id.* at 20-21.

[13]   *Id.* at 21.

beverages he or she consumes.[14]  Plaintiff Squiabro, for example, agreed that what is healthy for one person might not be for another, and depends on individual circumstances.  Squiabro Tr. 49:11-14; Volz. Tr. 108:17-21 (sugar does not pose the same health concerns for all people).

**Individuals Paid Different Prices And Do Not Retain Receipts**.  The Coca-Cola Company does not sell vitaminwater directly to consumers and does not set retail prices.[15]  Rather, it sells to distributors who sell to retailers, who then sell to consumers, and thus it is twice removed from the retail prices paid by consumers.[16]  This structure results in significant variations in the retail price of vitaminwater across time, locations, and type of retailer.[17]

The named plaintiffs confirm these differences.  Ms. Ford testified that she bought vitaminwater from sources that included hotels, mini-marts, gas stations and in bulk at Costco at prices that ranged from $1 to more than $2. Ford. Tr. 71:6-72:22.  Mr. Cook could not remember how much he paid, Tr. 67:23-68:3, but recalls the price varied depending on the type of store, Tr. 68:14-16; 69:1-13.  Mr. Armada thinks he paid somewhere between $2 and $3, and that supermarkets charged less than gas stations.  Armada Tr. 32:17-33:18.  Mr. Squiabro spent $14-15 per case at the supermarket.  Squiabro Tr. 27:9-19.  He would also buy single bottles from several locations for $1.50-$2.00.  *Id*. 27:20-25, 28:1-3. Mr. Squiabro admits he does not know how to prove how much he spent purchasing vitaminwater because "prices go up and down."  *Id*. 28:7-8.

No named plaintiff appears to have retained receipts for any of their vitaminwater purchases.  *See, e.g.* Ackerman Tr. 32:25-35:25; 55:25-57:2 (does not recall the specific prices

---

[14]  Applegate Exp. Rep. at 8.

[15]  Nesser Decl. Ex. M (Expert Report of Keith R. Ugone, Ph.D.) ("Ugone Exp. Rep.") ¶ 76.

[16]  *Id*. at 8.

[17]  *Id*. at 5.

paid and has no receipts); Khaleel Tr. 28:24-30:16; Cook Tr. 67:23-68:3; Armada Tr. 32:20-33:5; Koh Tr. 17:22-18:3; 83:21-84:2.  Dr. Scott's consumer survey showed that 70% of consumers do not retain their receipts over any appreciable period.[18]

## ARGUMENT

## I.   PLAINTIFFS BEAR A HEAVY BURDEN TO CERTIFY A CLASS

Plaintiffs bear the burden to justify class certification is appropriate.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Courts properly reject a "certify now and worry later" approach.  "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("*Dukes*").  The pleadings are not proof.  *Id.* at 2551.  A district court must determine that each Rule 23 requirement has been met.  *See In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("*IPO*").  The court must conduct a "rigorous analysis," *Dukes*, 131 S. Ct. at 2551, receiving "enough evidence, by affidavits, documents, or testimony," to confirm certification is appropriate.  *IPO*, 471 F.3d at 41; *see Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 -203 (2d Cir. 2008) ("preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements").  Plaintiffs rely exclusively on pre-*Dukes* certification authorities that cannot help them carry the significant burden the Supreme Court has now clarified.[19]

---

[18]   Scott Exp. Rep. ¶¶ 4(e), 41; *id.* Ex. 10-16.

[19]   The class action law of the transferee court governs the certification standards in an MDL action. *See In re Zyprexa Prods. Liab. Litig.,* 671 F. Supp. 2d 397, 430 (E.D.N.Y. 2009) ("a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit").  Nonetheless, the issue is of no moment with respect to the evidentiary considerations on a certification motion, because all federal jurisdictions are governed by *Dukes.*

## II.   THE PROPOSED CLASSES VIOLATE ARTICLE III AND ARE OVERBROAD

"No class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).  Article III standing requires, at minimum, an injury that is "concrete, particularized . . . [and] fairly traceable to the defendant's challenged action." *Horne v. Flores*, 557 U.S. 433, 445 (2009).  Here, plaintiffs seek a free pass on standing and reliance issues, based on the purported impact of New York and California decisions.  *See Br.* at 24 (asserting reliance is not an element of a claim under NY GBL §349); *id.* at 17 (citing *In re Tobacco II,* 207 P.3d 20 (Cal. 2009)*,* and contending that "[c]lass members do not need to individually show they have lost money or property as a result of deception").  This is not the law.

*First*, regardless of any relaxed standards under state-specific statutes, a plaintiff in federal court must establish Article III standing.  "[S]tatutory standing will not suffice to substitute for Article III standing." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 201 (2d Cir. 2005) (district court abused discretion by concluding plaintiff's standing under ERISA established Article III standing).  A class cannot be certified if it includes members who lack a cognizable Article III injury with the requisite causal connection to defendants' conduct—*even if the specific state law claims do not require such a showing.  See Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 790 (S.D.N.Y. 2011) (class member "lacks standing to bring a claim [under Article III] if he or she did not suffer the injury that gives rise to that claim," regardless whether standing requirements under GBL § 349, are met); *see also Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (citing *Denney* and holding "to the extent that *Tobacco II* holds that a single injured plaintiff may bring a class action on behalf of a group of individuals who may not have had a

cause of action themselves, it is inconsistent with the doctrine of standing as applied by federal courts").  Similar decisions are common.[20]

*Second*, even apart from Article III strictures, courts routinely hold that where a proposed class necessarily includes consumers who were not exposed to all of the allegedly misleading statements, or who did not rely upon them, the class definition is overbroad and cannot be certified—even after *Tobacco II*.  For example, in *Pfizer Inc. v. Superior Court*, 105 Cal. Rptr. 3d 795 (Cal. Ct. App. 2010)—as here—numerous differing products were at issue, many of which never bore the allegedly misleading claims.  Despite that the plaintiff argued *Tobacco II* eliminated the need to prove class members saw or relied on Pfizer's representations, the court found the class definition overbroad:  "[O]ne who . . . [did not] los[e] money or property as a result of the unfair competition is not entitled to restitution."  *Id*. at 803; *see also Sanders v. Apple Inc*., 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009) (class overbroad that included "individuals who either did not see or were not deceived by advertisements, and individuals who suffered no damages"); *Mazur v. eBay Inc*., 257 F.R.D. 563, 567 (N.D. Cal. 2009) (rejecting consumer class that was overbroad and not clearly identifiable); *Sevidal v. Target Corp*., 117 Cal. Rptr. 3d 66, 73-74, 83-85 (Cal. Ct. App. 2010) (class overbroad because plaintiff failed to show consumers all saw challenged statement); *Akkerman v. Mecta Corp., Inc*., 62 Cal. Rptr. 3d 39, 45-46 (Cal. Ct. App. 2007) (UCL class overbroad that included consumers who bought for reasons other than challenged disclosures).

---

[20]   *See also Oshana v. Coca-Cola Co*., 472 F.3d 506, 514 (7th Cir. 2006); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.,* No. MDL-1703, 2012 WL 1015806, at *6 -7  (N.D. Ill. Mar. 22, 2012).

## III.    PLAINTIFFS HAVE NOT DEMONSTRATED MEMBERSHIP IN THE PROPOSED CLASSES IS OBJECTIVELY ASCERTAINABLE

Ascertainability is an "implied requirement" of Rule 23.  *See IPO*, 471 F.3d at 30.  A

class is ascertainable "when defined by objective criteria that are administratively feasible, and

when identifying its members would not require a mini-hearing on the merits of each case."  *See*

*Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742, 2010 WL 3119452, at *12 (S.D.N.Y. Aug.

5, 2010).  In *Weiner*, on similar facts, the Court denied certification because there was no

administratively feasible mechanism to identify and verify purported class members:

> Plaintiffs suggest that . . . the Court could require that "[c]lass members produce a
> receipt, offer a product label, or even sign a declaration to confirm that the
> individual had purchased" a Snapple beverage within the class period.  This
> suggestion, to say the least, is unrealistic.  ***Plaintiffs offer no basis to find that***
> ***putative class members will have retained a receipt, bottle label, or any other***
> ***concrete documentation of their purchases*** of Snapple beverages bearing the
> "All Natural" description.

*Id.* at *13 (emphasis added).  *See also Xavier v. Philip Morris USA Inc.,* 787 F. Supp. 2d 1075,

1089 (N.D. Cal. 2011) (class not ascertainable where no records identified class members who

bought cigarettes); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 510 (7th Cir. 2006) (class of

consumers who bought fountain Diet Coke not ascertainable); *Campion v. Old Republic Home*

*Prot. Co., Inc.*, No. 09-CV-748, 2011 WL 1935967, at *6 (S.D. Cal. May 20, 2011) (no

ascertainability without framework to determine consumers "were exposed to the alleged

misrepresentations" before making purchases).[21]

---

[21]   "Related to but distinct from" ascertainability, is the issue of manageability, which is one of the "factors
to be considered in determining whether a class action is superior," under Federal Rule 23(b)(3).  *Weiner*, 2010 WL
3119452 at *12.  As the Second Circuit has explained, "whether the court is likely to face difficulties managing a
class action bears on whether the proposed class satisfies the predominance and superiority requirements."  *Sejias v.*
*Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).  Here as in *Weiner*, plaintiffs "have offered no explanation
for how such a geographically-dispersed class of consumers who purchased . . . beverages in different locations, at
different times, and for different prices, could be effectively managed."  *Weiner,* 2010 WL 3119452 at *12.

Even if individuals were permitted to assert class membership through declarations or testimony, defendants would have the right to cross examination, necessitating class-defeating mini-trials. *See Marcus v. BMW of N. Am., LLC*, -- F.3d ---, No. 11-11937, 2012 WL 3171560, at *7 (3d Cir. Aug. 7, 2012) ("class members' say so" is insufficient to satisfy ascertainability because "forcing [defendants] to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications"); *Perez v. Metabolife Int'l Inc*., 218 F.R.D. 262, 269 (S.D. Fla. 2003) (in class action, defendant must have "an opportunity to challenge the memory or credibility of the individual" consumer); *Thompson v. Am. Tobacco Co., Inc*., 189 F.R.D. 544, 554 (D. Minn. 1999) (same).  Here, for example, some named plaintiffs contend they were health-conscious yet consumed this sweet beverage as many as 500 times without ever checking the Nutrition Facts. Due process requires that defendants be afforded the opportunity to put such far-fetched claims to the test at trial and challenge each class member's credibility.[22]

Neither plaintiffs' master brief nor three of the four supplemental briefs even *mention* ascertainability, because no evidence shows any consumer retained receipts.[23]  The authorities above require that certification be denied for this reason alone.

## IV.   PLAINTIFFS HAVE NOT DEMONSTRATED COMMONALITY OR PREDOMINANCE OF COMMON ISSUES

### A.   Plaintiffs Bear The Burden To Demonstrate Commonality And Predominance

To satisfy the commonality requirement, a class claim must depend upon a contention "capable of classwide resolution—which means that determination of its truth or falsity will

---

[22]   These due process issues equally implicate predominance, typicality, and manageability issues discussed elsewhere in defendants' Opposition.

[23]   *See, e.g.* Ackerman Tr. 32:25–35:25; 55:25–57:2; Khaleel Tr. 28:24-30:16; Cook Tr. 67:23-68:3; Armada Tr. 32:20–33:5; Koh Tr. 17:22-18:3; 83:21-84:2.

resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*,

131 S. Ct. at 2551.  Specifically:

> What matters to class certification . . . is not the raising of common 'questions'—
> even in droves—but, rather the capacity of a classwide proceeding to generate
> common *answers*.

*Id.* at 2551 (emphasis in original).  *Id.*  If "dissimilarities within the proposed class" preclude

class-wide resolution, they are fatal no matter how many similarities can be identified.  *UFCW*

*Local 1776 v. Eli Lilly & Co*. 620 F.3d 121, 131 (2d Cir. 2010); *see also McLaughlin v. Am.*

*Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008) (reversing certification because "numerous issues

. . . [were] not susceptible to generalized proof").

Accordingly, in a recent deceptive marketing case, Judge Weinstein found purportedly

common "questions of state law liability" were mere "legal questions peripheral to the

certification decision."  *Haynes v. Planet Automall, Inc*., 276 F.R.D. 65, 79 (E.D.N.Y. 2011).

The alleged common questions there, such as "whether the alleged violations . . . constitute

deceptive practices under [GBL] § 349," *id*., are indistinguishable from the questions urged by

plaintiffs here, such as "[w]hether Defendants' marketing . . . constitutes an unfair, unlawful, or

fraudulent business practice," Br. at 12.  Rather than focusing on "peripheral" legal questions,

the proper inquiry is the extent to which common factual questions can be "answered uniformly

on a class-wide basis."  *Haynes*, 276 F.R.D. at 79.

Here, each claim would involve individualized answers to the purported common

questions.  These inquires concerning, for example, causation and injury, which are required

pursuant to applicable New York[24] and California[25] statutory law, and under Article III (*see* § II

---

[24]    *See Koch v. Acker, Merrall & Condit Co.,* 967 N.E.2d 675, 675 (N.Y. 2012) (causation required to
establish § 349 and § 350 claims); *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of NJ, Inc*., 448 F.3d

*supra*), would predominate. *Marcus*, 2012 WL 3171560 at *23 (if consumers "do not react to [product] information . . . in a sufficiently uniform manner, then individual questions related to causation will predominate").

### B. Plaintiffs Have Not Shown Causation Or Reliance Could Be Proven On A Common Basis

Whether any class member was misled in a material way by vitaminwater's labels cannot be decided on a class-wide basis because those individuals' opinions, knowledge, and purchasing decisions are determinative in that assessment. Considered from any angle, the plaintiffs' own evidence contradicts their unsupported assertion that the marketing of vitaminwater was "uniform," Br. at 2, and that "each class member was harmed in the same way," *id*. at 15.

#### 1. The Alleged Misrepresentations Were Not Uniform

Far from being "uniform," the multiple marketing statements at issue varied across product lines, by medium, and over time. The *Ackerman* Complaint focuses on 12 statements;[26] Ms. Ford's complaint concerns two other advertisements (an in-store ad and one on television), Compl. ¶¶ 20-27; and Mr. Squiabro testified about yet another two (that the word "healthy" allegedly appeared in large letters on the bottle,[27] and a music video with rapper Curtis Jackson),

---

573, 586 (2d Cir. 2006) (unjust enrichment requires proof "(1) that the defendant benefited; (2) at the plaintiffs expense; and (3) that equity and good conscience require restitution.").

[25] California UCL and FAL claims require proof of "injury in fact" as a result of the alleged deceptive practice. Cal. Bus. & Prof. Code §§ 17204, 17535; *Kwikset Corp. v. Super. Ct.*, 246 P.3d 877, 884 (Cal. 2011). In deceptive practice claims, this requires proof of actual reliance. *In re Tobacco II Cases*, 207 P.3d 20, 39-40 (Cal. 2009). It also requires proof that the consumer was actually deceived into spending money he would not otherwise have spent. *Kwikset*, 246 P.3d at 881. The California CLRA requires reasonable reliance and injury. Cal. Civ. Code § 1750; *Hill v. Roll Int'l Corp.*, 128 Cal. Rptr. 3d 109, 115-16 (Cal. Ct. App. 2011) (dismissing "green marketing" allegations because the plaintiffs' asserted "beliefs [did] not satisfy the reasonable consumer standard"). Unjust enrichment is available only where "a person has received a benefit from another… [and] the circumstances of its receipt or retention are such that . . . it is unjust for him to retain it." *F.D.I.C. v. Dintino*, 84 Cal. Rptr. 3d 38, 49 (Cal. Ct. App. 2008).

[26] *See Ackerman*, 2010 WL 2925955, at *5 (listing the 12 statements).

[27] Predictably, the record contains no evidence supporting this allegation.

Squiabro Tr. 10:24-13:11, 36:6-37:2.  The medium varied from television (two unique ads), to

the Internet (six unique statements), to an in-store advertisement, to statements on the bottles

themselves.  *See* Nesser Decl. Ex. R; Clark-Weintraub Decl. Ex. B.  Even as to statements on

bottles, little was "uniform":  (1) the purportedly deceptive "flavor names" varied across

vitaminwater's line of more than a dozen flavors; (2) the statement "vitamins + water = all you

need" appeared on only some flavors for only some years; and (3) the statement "vitamins +

water = what's in your hand," appeared on still other flavors, and only for certain years.  *See*

Clark-Weintraub Decl., Ex. B.  Plaintiffs' attempt to paper over these differences by referring to

the "uniform labeling of vitaminwater products" ignores these undisputed facts.

### 2.    *Whether Each Plaintiff Saw And Considered A Challenged Statement In Buying Vitaminwater Is An Individual Issue*

The named plaintiffs differed dramatically in the extent to which they saw, considered or

relied on the challenged marketing statements and whether those statements were material to

their purchasing decisions.  There is no evidence that even a single named plaintiff saw seven of

the twelve statements in the *Ackerman* Complaint.  As to the remaining allegations (apart from

the name "vitaminwater" itself), the number of plaintiffs who saw the statements or arguably

believed they were misleading ranged from three to four—fewer than half.  Several plaintiffs

testified that they had seen *no* vitaminwater advertising, and had never read *any* portion of the

label other than the name "vitaminwater," and in some cases the flavor name.  *See* Khaleel, Tr.

12:23-13:14; 24:21-25:2; Volz Tr. 78:8-24; Cook Tr. 29:23-30:25; Koh Tr. 62:17-24.

Even as to the name "vitaminwater," the plaintiffs differed in whether it played any role

in their purchase.  Ms. Ackerman, for example, bought the product solely on a friend's

recommendation, Ackerman Tr. 21:18-22:19; Mr. Armada made an impulse buy because the

"XXX" flavor name caught his attention, Armada Tr. 12:5-14:23; and Mr. Squiabro first bought

it because he saw a musician drink it in a music video, Squiabro Tr. 10-13.  The named plaintiffs, as well as consumers generally, also differed in how they understood the vitaminwater name. Six of nine named plaintiffs knew or suspected it contained sugar.  *Supra* at p.5.  Most consumers knew that as well.  Scott Exp. Report at 13.  More than 80% of consumers in this market segment read ingredient labels, understand exactly what the product contains, and could not be misled by the vitaminwater name.  *Id.*  The named plaintiffs conceded that consumers who, unlike them, read the clear disclosures on either side panel would not be deceived and would have no claims.  *See, e.g.,* Cook Tr. 121:2-22; Koh Tr. 130:8-12; Ackerman Tr. 106:4-10; Squiabro Tr. 64:1-24.  Unlike other plaintiffs, Ms. Ford and Ms. Ackerman thought the name implied differing information about the products' vitamin content.  Ford. Tr. 100:13-22; Ackerman Tr. 84:4-85:5, 93:3-94:18.  Certification will be denied even where there is a uniform statement if consumers draw different conclusions about the meaning.  *See, e.g., Caro v. Procter & Gamble Co*., 22 Cal. Rptr. 2d 419, 429-31 (Cal. Ct. App. 1993) (denying certification because plaintiff could not identify others amongst the class of "millions" that read the product's label as the plaintiff did).

This record falls comically short of what plaintiffs' counsel promised at the motion to dismiss hearing.  The Court specifically asked counsel for a representation about the myriad statements challenged in the Complaint:

THE COURT: So all of them [plaintiffs] relied on those specific statements?

MR. REESE: That's correct, Your Honor.

Nesser Decl. Ex. Q (Hr'g Tr. 17:15-17, *Ackerman,* No. CV-09-0395 (E.D.N.Y. Feb. 5, 2010)).

Likewise, the named plaintiffs delivered conflicting testimony concerning the materiality of the challenged statements and vitaminwater's sugar content.  Ms. Ackerman always knew it

contained sugar, and *continued to buy* vitaminwater even after reading the label to confirm the sugar level.  Ackerman Tr. 102:9-103:3.  Mr. Cook sued *without ever investigating how much sugar vitaminwater actually contained*, and at deposition conceded the sugar level of vitaminwater was "great."  Tr. 35:3-36:16; 58:21-59:3; 60:25-61:13.  Mr. Volz was never interested in the precise amount of sugar, only that it had less than sodas (which it does), and he now drinks Coca-Cola and Gatorade despite those products' higher sugar levels.  Tr. 22:3-9; 90:7-13.  Mr. Armada testified that "sugar content is "[n]ot important enough to read the label," Armada Tr. 65:11-14, and continued buying it for "[t]wo to three more months" after reading the label, Armada Tr. 47:16-22.  Mr. Koh was never concerned about the amount of calories in vitaminwater.  Tr. 138:12-19.  And rather than feeling misled about sugar, Ms. Ford's main complaint is that she thinks vitaminwater should more clearly disclose that vitamins are not invariably present in the full recommended daily amount.  Tr. 100:13-22.

The foregoing variations are echoed by survey evidence, which confirms consumers had more than 50 different reasons for buying vitaminwater,[28] with very few buying vitaminwater on the belief it had no calories, no sugar, or to lose weight;[29] wide variances in awareness of vitaminwater's sugar and calorie content;[30] and varying but low levels of importance attached to several challenged statements.[31]  Plaintiffs failed to challenge this evidence and proffer no affirmative evidence (as *Dukes* requires) to support the notion that any appreciable percentage of consumers buy vitaminwater on the belief it has no sugar.  *See Abby v. Paige,* -- F.R.D. ---, No. 10-23589, 2012 WL 1564011, at *3 (S.D. Fla. May 2, 2012) ("an alleged common violation by a

---

[28]  Scott Exp. Rep. at Ex. 10-2 and 10-3.

[29]  *Id.* at 2.

[30]  *Id.* at 13.

[31]  *Id.* at 15-17, 21 and Ex. 10-12.

defendant is insufficient to meet a plaintiff's burden on a motion for class certification absent evidence that the numerous, ascertainable class members were harmed in the same way by the defendant's actions"); *Rader v. Teva Parenteral Medicines, Inc.*, 276 F.R.D. 524, 530 (D. Nev. 2011) ("[t]o warrant class certification . . . Plaintiff must demonstrate that causation can be proved as to all class members using classwide proof, not mere unsupported assumptions and generalities").

In addition, the extent to which consumers knew of vitaminwater's sugar levels from sources other than the label varied by time, geography, and consumers' media consumption habits, including as a result of CSPI's attempts, through this litigation and otherwise, to raise awareness of just these issues.[32] *See In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II),* No. 03-4558, 2012 WL 379944, at *15 (D.N.J. Feb. 6, 2012) (denying certification because "it would take individualized causation inquiries to determine which putative class members saw . . . news reports prior to their purchase of [the van] and [thereby] understood the van to have handling problems"); *Lawrence v. Philip Morris USA, Inc.*, -- N.E.2d ---, No. 2011-574 (N.H. Aug. 21, 2012) (reversing certification because non-de minimis public awareness of the challenged conduct created individual issues of causation and injury), *available at* www.courts.state.nh.us/supreme/opinions/2012/2012086philipmorris.pdf.

Finally, whereas the central premise of plaintiffs' motion is that vitaminwater was deceptively marketed as "healthy," the plaintiffs' undisputed testimony and the defendants' undisputed expert submissions show that notions of what is "healthy" vary:  what can be healthy for one person might not be for another.  *See* Applegate Exp. Rep. at 8; Squiabro Tr. 49:11-14. In short, there was nothing "uniform" about the alleged misstatements, or whether and how those

---

[32] *See* Swisdak Exp. Rep. at 2.

statements impacted the putative class members' purchase decisions.  Rather, at every step from dissemination of the statements, to consumers' viewing of the statements, interpretation, and decisions to purchase vitaminwater as a result of the statements (or not), individualized inquiries abound.

No class can be certified on this record.  As the Second Circuit explained, "reliance on a misrepresentation made as part of a nationwide marketing strategy cannot be the subject of general proof."  *UFCW*, 620 F.3d 121, 133 (2d Cir. 2010) (quotation marks omitted).  *See also McLaughlin,* 522 F.3d at 223 ("because each individual consumer might have purchased light cigarettes for any number of reasons other than the purported health claim, individualized proof was necessary to show the causal link").  As another court explained:

> Whether a plaintiff saw an advertisement; whether the particular advertisement was fraudulent; whether that plaintiff relied on the advertisements; and whether the plaintiff was damaged as a result of the advertisement are all individual questions of fact . . . .  Because [defendant's] . . . advertising changed over time, what and when a plaintiff saw the advertisement will differ from plaintiff to plaintiff, directly affecting whether [defendant] violated any consumer fraud laws.

*In re Prempro*, 230 F.R.D. 555, 567 (E.D. Ark. 2005). Similarly:

> Even assuming that all members of the class saw the same advertisements, questions as to whether each individual was reasonably misled by them predominate, given the alternative sources of information about DSL service that each may have had . . . .  Thus, individual trials would be required to determine whether a reasonable consumer acting reasonably in each plaintiffs circumstances would have been misled by defendant's representations.

*Solomon v. Bell Atl. Corp.,* 777 N.Y.S. 2d 50, 56 (N.Y. App. Div. 2004) (reversing certification as to alleged misrepresentations concerning internet speed in violation of GBL 349 and 350).

The same is true for plaintiffs' unjust enrichment claims, as the Seventh Circuit recently held in reasoning applicable to all of the causes of action at issue:  "It would not be unjust for a manufacturer to retain the money paid by a consumer for a product when this consumer

22

. . . would not have acted any differently had he known the truth." *Cleary v. Phillip Morris Inc*., 656 F.3d 511, 519-20 (7th Cir. 2011).  Furthermore:

> [T]he class of people with a valid unjust enrichment claim would include the consumer who bought cigarettes and was never injured in any manner by his purchase.  It would include the consumer who was satisfied by his cigarette purchase and planned to continue purchasing cigarettes.  It would include the consumer who would not have acted any differently had he been fully informed about cigarettes, but bought them anyway regardless of the defendants' marketing.  It would include the consumer who was not deceived by the marketing because he was personally aware of the true nature of cigarettes, but still bought cigarettes despite their addictive and harmful nature—or even because of it.

*Id*.  That reasoning applies here given the varied facts cited above.  *See also Weiner,* 2011 WL 196930 at *5 (unjust enrichment claim failed because "plaintiffs [had] not shown that they paid a price premium . . . *as a result of* the labeling") (emphasis added).

### 3.    The "Reasonable Consumer" Standard Cannot Resolve Class Issues Of Causation, Reliance, Or Materiality

Plaintiffs wrongly suggest that the "reasonable consumer" standard obviates any need to demonstrate commonality as to materiality or reliance.  Nothing in that substantive liability standard relieves a plaintiff from demonstrating at the certification stage, through "substantial" evidence that the class was uniformly exposed to the challenged representations and that the representations were universally material and played an injury-causing role in the transaction.  Thus, even after *Tobacco II,* courts routinely deny certification under consumer statutes that employ a "reasonable consumer" standard.  As a California federal court reasoned:

> [I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action . . . .  Because [the] evidence establishes that awareness of a disclosure would almost certainly vary from consumer to consumer, it shows that the element of reliance cannot be established by the reasonable consumer standard.

*Webb v. Carter's Inc.,* 272 F.R.D. 489, 502 (C.D. Cal. 2011) (emphasis added); *see also*

*Edwards v. Ford Motor Co.*, No. 11-CV-1058, 2012 WL 2866424 at *9-10 (S.D. Cal. June 12,

2012) (denying certification of CLRA claim for lack of predominance, and holding that

"materiality varies from consumer to consumer," where evidence showed that plaintiff "did not

research her [car] ahead of time, did not seriously investigate the car on the date of her purchase,

. . . essentially made her decision to purchase her car on the spot and without express concern for

safety issues," "continued to drive her Freestyle for months" even after discovering the alleged

defect," and where "expert evidence [showed] that the level of importance a potential car buyer

places on safety concerns varies from consumer to consumer"); *Cohen v. DirectTV, Inc*., 101

Cal. Rptr. 3d 37, 49 (Cal. Ct. App. 2009), *review denied* (Feb. 10, 2010); *Pfizer*, 105 Cal. Rptr.

3d at 803-04; *Target*, 117 Cal. Rptr. 3d  at 83-84.

>    **4.    *No Presumption Of Reliance/Causation Can Apply To Bootstrap A Predominance Finding***

Similarly, courts will not adopt classwide presumptions of reliance/causation where, as

here, the fact record cannot support sufficient uniformity in consumer experience.  *See, e.g.,*

*Osborne v. Subaru of Am., Inc*., 243 Cal. Rptr. 815, 823 (Cal. Ct. App. 1988) (no inference of

reliance where, as to some class members, the challenged representations did not form "a part of

the transaction"); *Mirkin v. Wasserman*, 858 P.2d 568, 575 (Cal. 1993) (same); *Martin v.*

*Dahlberg, Inc*., 156 F.R.D. 207, 217 (N.D. Cal. 1994) (same).  In contrast, plaintiffs cite *Johns v.*

*Bayer Corp*., 280 F.R.D. 551 (S.D. Cal. 2012), which involved an alleged misrepresentation "all

class members *necessarily saw.*"  *Id.* 558 n.5 (emphasis added).  The record cannot allow any

such conclusion here, where some statements appeared only on television, others only in in-store

advertising, and others only on the Internet; where the statements on bottle labels varied among

flavors and over time; and where multiple named plaintiffs testified they never saw or relied

24

upon various the statements that appeared on vitaminwater bottles.  Plaintiffs nowhere address these inconvenient facts.

Nor are plaintiffs aided by *Fitzpatrick v. General Mills, Inc.,* 635 F.3d 1279 (11th Cir. 2011).  Br. at 4.  That case involved an alleged false affirmative representation about the digestive benefits of yogurt, and there was no evidence any class member knew those statements were false but bought the product anyway.  Here, by contrast, plaintiffs concede that accurate sugar and vitamin levels were disclosed on the label and that anyone who read the label could not have been deceived.  Dr. Scott's survey shows that a majority of consumers for this type of product *do* read labels.  *See* Scott Exp. Rep. ¶ 4(b).  Indeed, *Fitzpatrick* has already been criticized for its failure to consider causation issues.  *See In re Ford Motor Co.,* 2012 WL 379944, at *29 (finding that *Fitzpatrick* failed to consider developments in Florida law regarding FDUTPA's causation requirement and observing that causation appears not to have been raised on the *Fitzgerald* appeal).  Nor did *Fitzpatrick* consider the Article III implications of its analysis, discussed above.  Finally, *Fitzpatrick* involved a single uniform representation that appeared on all products and was with respect to the central premise of the product at issue. Here, plaintiffs challenge a dozen statements, the majority of which did not appear on all products, did not go to the central message of the product, and varied over time.[33]  *See In re Sears*, 2012 WL 1015806, at *6 (*Fitzpatrick* analysis inapplicable to FDUTPA claim where there were many products and a variety of advertisements at issue in a single claim).[34]

---

[33]   Even as to the name vitaminwater, there is no evidence that every plaintiff considered that name in making their purchase, or that the understood it similarly (*i.e.,* most if not all plaintiffs understood the product contained sugar or ingredients in addition to vitamins and water).

[34]   Plaintiffs' reliance on *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418 (S.D.N.Y. 2009) and *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29 (E.D.N.Y. 2008) fails as well.  Neither case implicated consumers' individual perceptions of subjective terms in making a purchasing decision, or a multiplicity of alleged misrepresentations as here.  *Jermyn,* for example, involved a uniform bait-and-switch practice in which Best Buy

### 5.    *Federal Law Preempts Purportedly Common Questions Relating To Vitaminwater's Sugar Content*

Finally, plaintiffs contend the key common question is whether vitaminwater's purportedly high sugar content renders the beverages unhealthy.  Br. at 2-3.[35]  Even if that question could be answered with common evidence (it cannot, as shown above), "express preemption bars any claim solely premised on the notion that vitaminwater's high sugar content made its health or implied nutrient content claims misleading."  *Ackerman*, 2010 WL 2925955 at *13; *see id.* *8 ("any claim . . . solely premised on the notion that vitaminwater's high sugar content made its health or implied nutrient content claims misleading is preempted by the FDA's express decision to not recognize sugar as a disqualifying nutrient").  And several plaintiffs concede their claims are solely about sugar content.  *See* Cook Tr. 127:2-5 ("The only thing [this] lawsuit is about is the amount of sugar in [vitaminwater]"); Volz Tr. 16:6-9 (consumers "were deceived in the purchase of Vitaminwater believing it did not have sugar"); Squiabro Tr. 45:24-46:2 ("problem with . . . vitaminwater is that it had a [large] amount of sugar in it").  Plaintiffs cannot invoke a purported common fact question that relates only to a preempted legal theory.[36]  *See Amchem*, 521 U.S. at 622-623 (facts relevant to predominance inquiry must bear on a "genuine controversy"); *Myers v. Hertz Corp.,* 624 F.3d 537, 547 (2d Cir. 2010) (same).

---

allegedly advertised a price match guarantee policy but pursued an undisclosed policy of aggressively denying legitimate requests for price-matching.  As another court has recently noted, "the refusal to match lower prices plainly caused injury to the members of the [*Jermyn*] class *as defined*," because the proposed class was explicitly limited to those who could demonstrate that they had been denied the benefit of the price match guarantee.  *Oscar v. BMW of N. Am., LLC*, No. 09 Civ. 11, 2012 WL 2359964, at *7 (S.D.N.Y. Jun. 19, 2012) (emphasis added).  The same is true for *Dupler*, in which "[t]he plaintiff class had paid for membership access to a particular store for a designated period of time, and Costco's undisclosed policy of shortening that time period necessarily deprived those customers of a readily determined portion of that value."  *Oscar*, at *7-8.

[35]  *See* Br. at 4-5 ("Each . . . Plaintiff[] … testified that as a result of the deceptive labeling, they viewed vitaminwater as a beverage that would assist them in maintaining *healthy* dietary practices.") (emphasis added).

[36]  Although Judge Gleeson identified three potential exceptions to preemption, none applies.  First, the purportedly common misrepresentations concerning sugar plainly could not suggest that vitaminwater's nutrient

### C.     Plaintiffs Have Not Shown An Injury Common To All Class Members

To obtain certification, plaintiffs must present "a likely method for determining class damages."  *Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 379 (N.D. Cal. 2010); *see also Weiner,* 2010 WL 3119452 at *6 (action under GBL § 349 cannot be certified without reliable methodology for proving classwide damages).  Plaintiffs admit they have this obligation, *see* Br. at 19-20, but make no effort to meet it.

Plaintiffs devote only one paragraph to how their injury can supposedly be proven on a classwide basis, stating merely that damages can be determined by "the price paid for Defendants' products."  They ignore that no single price was paid by any plaintiff, at any time, in any geographic location.  *See* Ugone Exp. Rep. ¶¶ 48, 76.  They also disregard that plaintiffs admit making purchases with full knowledge of vitaminwater's ingredients and thus were not injured, which further implicates individual issues.  *See, e.g.,* Ackerman Tr. 106:4-18 (conceding she was not deceived when she continued buying vitaminwater after reading the label).  This blunt instrument approach does not begin to provide a reliable method to compute damages.

Aggregate damages methodologies that involve "roughly estimating the gross damages to the class as a whole and only subsequently allowing for processing of individual claims" are impermissible.  *See McLaughlin,* 522 F.3d at 231; *In re Zyprexa*, 671 F. Supp. 2d at 434 ("appellate class action decisions have held that issues of reliance, loss-causation, and injury are

---

content "would help consumers maintain healthy dietary practice" as to matters *other* than sugar.  *Ackerman* at *15.  Second, the purportedly common misrepresentations concerning sugar did not address "the relationship of a nutrient to a disease or health-related condition."  *Id.* at 11 (giving as an example the statement that a certain flavor of vitaminwater  had been "specially formulated to provide . . . nutrients [that] . . . may reduce the risk of age-related eye disease").  Third, in light of the testimony of multiple witnesses who always knew that vitaminwater contained coloring, sweeteners, and other ingredients, the evidence cannot support any notion that consumers uniformly believed the name vitaminwater created a "mistaken belief that the product is comprised of only vitamins and water."  *Id.* at *12; *see e.g.,* Cook Tr. 47:1-22; 98:-9 (knew it contained sugar and at least five other ingredients); Volz Tr. 40:13-15; 35:18-20 (knew it had natural sweeteners).

inappropriate for aggregation, due to the need to prove these elements on an individualized basis for each victim or injured party").  Further, such rough justice approaches also fail to take into account that, at trial, plaintiffs must prove their membership in the class.  *See In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, No. 08-1000-CV, MDL No. 1967, slip op. at 2 (W.D. Mo. July 23, 2012) (plaintiff will need to prove she owned the product at issue), *available at* www.mow.uscourts.gov/mdl/1967/doc_869.pdf; *Weiner*, 2010 WL 3119452, at *13 (deeming it "unrealistic" that members of the class would have retained receipts or labels that would identify them as members of the class).  The problem is compounded by the fact that people have a tendency to want to associate themselves with successful classes.  *See Xavier,* 787 F. Supp. 2d at 1090 (impermissible to let class members self-identify).  Plaintiffs never even broach the topic of how this issue might be addressed, let alone present a methodology for resolving it.

The *Weiner* case is closely analogous and demonstrates why plaintiffs' failure to offer any evidence as to how injury can be proven on a class basis dooms their predominance showing.  There, plaintiffs claimed that Snapple's labeling was deceptive because it identified the beverage as "all natural" when in fact it contained a chemical substance.  Plaintiffs sued under GBL § 349, claiming consumers would not have purchased Snapple had they known the actual composition of the drink.  At class certification, plaintiffs relied on an expert report suggesting two approaches for classwide damages.  Plaintiffs' expert claimed he could develop an algorithm to prove damages on a classwide basis, but made his claim without performing any empirical analysis or providing any relevant data—weak, but still more of a showing than plaintiffs make here where they have identified no expert, no approach, no analysis, and no data.

The *Weiner* court struck plaintiffs' expert as unreliable.  The court explained that plaintiffs were required to show they "in fact paid more for Snapple beverages *as a result of*

Snapple's 'All Natural" labeling . . . and that they could, at trial, marshal facts sufficient to permit them to rely upon" their proposed methodology.  *Id.* at *6 (emphasis in original).  The court concluded that "[i]ndividualized inquiries as to causation, injury, and damages for each of the millions of putative class members would predominate" such that plaintiffs had not met their burden to provide a classwide damages methodology.  Other than the fact that the *Weiner* plaintiffs at least tried to meet their proof burden with an expert report, there is no principled distinction between that case and this one.  The same result should thus obtain:  plaintiffs should be deemed to have failed to meet their burden to prove that individual issues do not predominate.

The Expert Report of Keith R. Ugone demonstrates there is no reliable method to determine damages on a classwide basis in this case, as he did in *Weiner*.  Dr. Ugone's ultimate conclusions are that "individualized inquiry is required to determine the fact and quantum of injury" and that awarding damages on a "class-wide basis would result in awarding damages to putative Class members who actually suffered no injury."  Ugone Exp. Rep. at ¶¶ 4-5.  Both conclusions undermine certification of plaintiffs' proposed class.  Some of the data and principle conclusions of Dr. Ugone's report are as follows:

• Even if the price paid by retailers were an appropriate damages measure (which defendants dispute), retailers did not pay a uniform price.  For example, pricing varies based on whether the beverage was sold in a single pack 32-ounce container or a 4 pack of 12-ounce containers.  Ugone Report ¶ 76.  Moreover, the sales at issue spanned a 9-year period.  *Id.* ¶ 48.  During that period, prices necessarily varied.

• In *Weiner,* the Court required plaintiffs to show they paid more as a result of the "all natural" labeling, *i.e.,* a "price premium."  To establish the price premium, plaintiffs and class members would be required to prove their purchase prices.  *Id.* ¶ 6.  The Coca-Cola

Company does not set retail prices nor sell directly to consumers; rather, it sells to distributors who sell to retailers who then sell to consumers. The Company is thus twice-removed from the retail prices consumers pay.

- Consumers bought through different distribution channels at different time periods in different geographic locations, all of which bear on price. *Id.*, *e.g.* ¶¶ 4, 7-9, 42-48. There are significant variations in the retail price of vitaminwater across time, locations, and retailers. The factors that impact the wide fluctuation in actual prices include: (1) the type of retailer because grocery stores, convenience stores, and other retailers charge different prices; (2) retailers within the same category; (3) different store locations of the same retail chain; (4) city or geographic locations; (5) bottle size and type of packages purchased; and (6) use of a coupon or promotional discounts. *Id.* ¶ 6. In *Weiner,* the facts showing variations in pricing based on geography and other factors, as well as the fact that individual class members would have no way to prove they actually purchased the product were deemed significant to the determination that individual issues predominated. 2010 WL 3119452 at *7, *9, *12, *13.

- The named plaintiffs' testimony confirms the futility of seeking a method of compensation that would not require individual inquiries. They estimate the prices they paid ranged from $1-3 per bottle (*compare* Ford. Tr. 71:6-72:22. *with* Armada Tr. 32:17-33:18); recall the price varied significantly by type of store (Cook Tr. 68:14-16; 69:1-13; Armada Tr. 32:17-33:18); and did not recall exact prices (Cook Tr. 67:23-68:3; Armada Tr. 32:17-33:18). Mr. Squiabro did not save receipts and admits he does not know how one could prove how much he spent purchasing vitaminwater because "prices go up and down." Squiabro Tr. 28:7-8.

- There is no reliable way to establish whether plaintiffs even paid a premium because it "was not sold at a consistently higher retail price than benchmark (*i.e.*, similarly-

situated non-accused product(s)).”  Ugone Exp. Rep. ¶ 8.  In fact, there are “wide variations” in the price among vitaminwater and benchmark products.  *Id.*

•      As in *Weiner*, Dr. Ugone’s report demonstrates that “[i]ndividualized inquiries would . . . be required in order to determine whether . . . any . . . premium was attributable to,” *i.e.,* caused by, the alleged misrepresentations.  *Weiner* at *10; Ugone Exp. Rep. ¶ 35.

Even if plaintiffs could establish a uniform price caused by the alleged misrepresentations —and no data suggests they can—they have an additional hurdle:  they cannot establish the quantity of vitaminwater purchased.  No named plaintiff appears to have retained receipts, and none can do better than guesstimate how much vitaminwater he or she bought, over what time period, and at what price.  *See* Ackerman Tr. 32:25–35:25, 55:25–57:2; Khaleel Tr. 28:24-30:16; Cook Tr. 67:23-68:3; Armada Tr. 32:20-33:5; Koh Tr. 17:22-18:3; 83:21-84:2.  Dr. Scott’s survey confirmed the common sense notion that most consumers do not save receipts for this type of product.  Scott Exp. Rep. ¶¶ 4(e), 41; Ex. 10-16.

Plaintiffs fail to acknowledge any of these problems with classwide damages, let alone propose an approach to resolving them, which dooms their request for class treatment.  *See Dukes,* 131 S. Ct. at 2551 (2011) (common issues can be resolved “in one stroke”).  As in *Weiner*, “[i]ndividualized inquires would . . . be required in order to determine whether class members in fact paid a premium for” vitaminwater, “and whether any such premium was attributable to the” product’s labeling.  2010 WL 3119452 at *10.  This is not only a problem in managing variations among the class members’ damages, as plaintiffs insist—to the contrary, as in *Weiner*, plaintiffs have “offer[ed] no evidence that a suitable methodology is available to prove the elements of causation and actual injury on a class-wide basis.”  *Id.*  And plaintiffs’ insistence that *Tobacco II* relieves much of their burden is off the mark.  *Tobacco II* was directed

to the issue of standing for a UCL action; the California Supreme Court made clear that it was not addressing nor changing the requirements for class certification.  207 P.3d at 33-35.

### D.      Defendants' Affirmative Defenses Raise Individual Issues

"[C]ourts must consider potential defenses in assessing the predominance requirement." *Myers*, 624 F.3d at 551.  One such defense is the voluntary payment doctrine, which "bars recovery of payments voluntarily made with full knowledge of the facts."  *Solomon,* 777 N.Y.S.2d at 56 (denying certification because doctrine would "bar recovery by any subscriber who, having experienced slow service and/or frequent connectivity outages, continued to use defendants' DSL service").  Courts regularly deny certification based on this doctrine.[37]  Here, Ms. Ackerman continued to buy vitaminwater even after she read the label, admitting that she was "not deceived" and is "not entitled to get [her] money back," for those purchases.  Tr. 106:4-10.  At least four other plaintiffs testified similarly.[38]  The voluntary payment doctrine bars their claims and individual inquiry is necessary to determine if it also bars class members' claims.

Moreover, because the proposed class periods extend back to 2003 (New York) and 2005 (California), laches could bar stale claims.  *See Matter of Schulz v. State of New York*, 615 N.E.2d 953, 957 (N.Y. 1993).  More, the proposed classes include claims barred by statutes of limitations.  For example, claims by consumers who read vitaminwater labels or knew about allegations in the *Ackerman* complaint before January 2006 are barred by the three-year

---

[37]   *McLaughlin*, 522 F.3d 215, 222-23 (2d Cir. 2008) (reversing certification because plaintiffs' continued purchases suggested "the influence of some other motivation," raising individual causation issues); *Gary Plastic Packaging Corp. v. Merrill Lynch*, 903 F.2d 176, 179-80 (2d Cir. 1990) (certification properly denied where plaintiff continued purchasing CDs despite knowledge of alleged fraud); *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 78-79 (S.D.N.Y. 2006) (denying certification because plaintiff paid his bill despite knowledge of inadequate internet service);  *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 308 (S.D.N.Y. 2004) (denying certification where plaintiff continued to use credit card after discovering purportedly improper fee).

[38]   *See e.g.,* Squiabro Tr. 19:16-18 ("kind of slowed down on it [but] didn't stop drinking it. . . ."); Armada Tr. 47:16-22 (continued buying for "[t]wo to three more months"); Khaleel Tr. 15:12-22; 21:10-22:10 (continued buying); Antonov Tr. 27-28, 31 (same).

limitations applicable to (a) New York GBL 349 and 350, (b) the California CLRA, and (c) California unjust enrichment.[39]  Plaintiffs' failure to offer a classwide means of determining how many members' claims are time-barred defeats commonality.  *McLaughlin*, 522 F.3d at 233-234.

## V.  THE NAMED PLAINTIFFS ARE NOT TYPICAL

Plaintiffs must establish that their claims are typical of those that would be asserted by the people they claim to represent.  Fed. R. Civ. P. 23(a)(3).  Courts routinely find no typicality in consumer cases where evidence shows the claims turn on varying facts.  In *Kowalski v. YellowPages.com, LLC*, No. 10 Civ. 7318, 2012 WL 1097350 at *18 (S.D.N.Y. Mar. 31, 2012), the court denied certification based on "variations in the fact patterns of individual YellowPages.com customers."  Typicality was defeated by the "multiple products at issue . . . with multiple alleged misrepresentations relating to particular products at different times."  *Id.*; *see also Gartin v. S&M Nutec LLC*, 245 F.R.D. 429, 434-35 (C.D. Cal. 2007) (plaintiff not typical where her experience differed in outcome-determinative ways from other class members).

Courts also will not deem a named plaintiff typical when he or she sues over a line of products with varying representations but did not buy every product.  *See Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 666 (C.D. Cal. 2009) (no typicality because "Dannon ha[d] made different health benefit claims" regarding various products); *Lewis Tree Serv., Inc. v. Lucent Techs. Inc.*, 211 F.R.D. 228, 234 (S.D.N.Y. 2002) (no typicality where plaintiff bought two of sixty products).

For the same reasons discussed as to commonality and predominance, plaintiffs cannot meet their burden to demonstrate typicality, including (1) whether each plaintiff read the

---

[39]  *See People ex rel. Spitzer v. County Bank of Rehoboth Beach, Del.*, 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) (GBL 349, 350); Cal. Civ. Code. 1783 (CLRA); *F.D.I.C. v. Dintino,* 84 Cal. Rptr. 3d 38, 50 (Cal. Ct. App. 2008) (unjust enrichment).

vitaminwater label; (2) each plaintiff's definition of "healthy"; (3) the price each plaintiff paid;

and (4) each plaintiffs' awareness of media reports disclosing vitaminwater's sugar content.[40]

## VI.     RULE 23(B)(2) CERTIFICATION IS INAPPROPRIATE

Finally, plaintiffs' argument that an injunctive class is appropriate under Rule 23(b)(2),

Br. at 15-16, is completely unfounded.  "*Wal-Mart* held that Rule 23(b)(2) does not authorize

class certification when—despite the suitability of generalized injunctive or declaratory relief—

each class member would [also] be entitled to an individualized award of monetary damages."

*Nationwide Life Ins. Co. v. Haddock,* 460 Fed. Appx. 26, 29 (2d Cir. 2012).  Thus, "a class

complaint alleging numerous individual claims for monetary relief may not be certified under

Rule 23(b)(2), at least where . . . the monetary relief is not incidental to the injunctive or

declaratory relief."  *Dukes,* at 2558.

Here, monetary damages are the plaintiffs' primary goal.  Indeed, because the named

plaintiffs are now aware of vitaminwater's sugar content and have stopped drinking it, monetary

damages is their only meaningful remedy.  *See Gonzales v. Comcast Corp*., No. 10-cv-01010,

2012 WL 10621, at *16 (E.D. Cal. Jan. 3, 2012) ("vast majority of class members would have no

claim for injunctive relief, because they are, by definition, former Comcast subscribers").[41]

Even as to an injunction, Rule 23(b)(2) only authorizes certification if defendants "acted

or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is

---

[40]   Further illustrating plaintiffs' complete indifference to *Dukes,* plaintiffs offer no evidence whatsoever to establish numerosity.  *Duke*s, 131 S. Ct. at 2551 (a plaintiff "must be prepared to prove that there are **in fact** sufficiently numerous parties") (emphasis added); *see also Shields v. Walt Disney Parks and Resorts US, Inc*., 279 F.R.D. 529, 546 (C.D. Cal. 2011) ("[W]here evidence of numerosity is entirely lacking, the Court cannot substitute its imagination—no matter how commonsensical—in place of facts.").

[41]   *See also In re Ford Motor Co.*, 2012 WL 379944, at *37 -39 (denying certification and holding that an injunction requiring changes to future products would not "compensate[] the injuries of putative class members, who . . . have already purchased or acquired" the product); *Cholakyan v. Mercedes-Benz, USA, LLC*, -- F.R.D. ---, 2012 WL 1066755, at *18-20 (C.D. Cal. 2012) (same).

appropriate respecting the class as a whole." *See Brown v. Kelly*, 609 F.3d 467, 482 (2d Cir. 2010). This is so "only when a single injunction . . . would provide relief to each member of the class," and it addresses situations—such as unlawful race or other class-based discrimination—in which one order necessarily, and without more, would benefit all class members. *Dukes* at 2557. Here, due to the large number of different products sold to different plaintiffs at different times pursuant to over a dozen challenged marketing statements that only some plaintiffs saw, there is no "indivisible injunction" that would "benefit[] all class members at once." *Id.*

Last, the numerous individual issues detailed throughout this brief doom Rule 23(b)(2) certification for the same reasons Rule 23(b)(3) certification is inappropriate.

## CONCLUSION

Plaintiffs fail to offer evidence sufficient to satisfy their burden under *Dukes*, and the actual evidence demonstrates they cannot do so: The proposed classes are overbroad, unascertainable, and unmanageable, and are comprised of individuals with widely varying experiences and understandings as to the existence, meaning, and materiality of the more than a dozen different statements at issue, which appeared in different media at different times as to different vitaminwater flavors. There is nothing uniform about the plaintiffs' claims or alleged injuries. Class certification should be denied.

DATED: New York, New York
         August 24, 2012

                                        By:    /s/ Faith E/ Gay
                                           Faith E. Gay (FG-9357)
                                             *faithgay@quinnemanuel.com*
                                           Shon Morgan
                                             *shonmorgan@quinnemanuel.com*
                                           Isaac Nesser
                                             *isaacnesser@quinnemanuel.com*
                                           QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
                                           51 Madison Avenue, 22nd Floor
                                           New York, New York 10010

Telephone:  212.849.7220
Facsimile: 212.849.7100


James R. Eiszner
   *jeiszner@shb.com*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO  64108-2613
Telephone:  816.474.6550
Facsimile:  816.421.5547

Tammy B. Webb
   *tbwebb@shb.com*
SHOOK, HARDY & BACON L.L.P.
One Montgomery, Suite 2700
San Francisco, California  94104
Telephone: 415.544.1900
Facsimile: 415.391.0281